**Law Offices of Ty Hyderally, PC**
96 PARK STREET
MONTCLAIR, NEW JERSEY 07042
TELEPHONE (973) 509-3581
FACSIMILE (973) 509-7090
Attorneys for Plaintiff: Karama Thomas

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KARAMA THOMAS**<br><br>         **PLAINTIFF,**<br><br>**VS.**<br><br>**NEWARK POLICE DEPARTMENT, SUPERIOR OFFICERS' ASSOCIATION, IVONNE ROMAN, GARRY F. MCCARTHY, DENNIS SANDERS, RICHARD CUCCOLO, CRYSTAL BURROUGHES, BEATRICE GOLDEN, JOHN SIINO, CAROLINE CLARK, and DANIEL ZIESER,**<br><br>         **DEFENDANTS.** | **CIVIL ACTION NO.:**<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Karama Thomas, ("Thomas" or "plaintiff"), who resides at 5 Norman Road, Newark, NJ 07106, County of Essex, by way of this Complaint against the defendants, Newark Police Department, Superior Officers' Association, Ivonne Roman, Garry F. McCarthy, Dennis Sanders, Richard Cuccolo, Crystal Burroughes, Beatrice Golden, John Siino, Caroline Clark, and Daniel Zieser (hereinafter collectively the "Defendants") hereby says:

### I. Nature of Action, Jurisdiction, and Venue

1.  This is an action seeking equitable and legal relief for: (1) a violation of 42 U.S.C. § 1983; (2) a violation of 42 U.S.C. § 1985; (3) a violation of 42 U.S.C. § 1988; (4) Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"); (5) Retaliation/ a violation of Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980); (6) intentional infliction of

emotional distress; (7) invasion of privacy; (8) breach of express contract; (9) breach of implied contract; (10) breach of implied covenant of good faith and fair dealing; and (11) New Jersey Wage Payment Act, N.J.S.A. 34:11-4.1, *et seq.*

2. This court has jurisdiction due to the nature of the action and the amount in controversy.

3. Venue is appropriate in this court due to the amount in dispute and nature of claims asserted.

4. Plaintiff resides in Northern New Jersey, Plaintiff worked in Northern New Jersey; Defendants have an office and do business in Northern New Jersey; and some of the causes of action occurred in Northern New Jersey.

5. Thomas also filed two Notices of Claim. (Exhibit "1" and "2"). Subsequently, Defendants took no responsive action after the filing of plaintiff's Notices of Claim.

6. Thus, Plaintiff has satisfied all prerequisites to bringing these claims.

## II. Parties

7. Plaintiff is a Police Officer for the Newark Police Department.

8. Newark Police Department employs plaintiff to perform work duties in the State of New Jersey and is subject to suit under the statutes plead herein.

9. The Superior Officers' Association is an independent organization that intentionally authored an article that was widely disseminated that resulted in significant trauma to plaintiff.

10. Ivonne Roman is currently a Lieutenant in Internal Affairs and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

11. Garry F. McCarthy is currently the Director of Police for the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

12. Dennis Sanders is currently a Lieutenant and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

2

13. Richard Cuccolo is currently a Captain and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

14. Crystal Burroughes is currently a Lieutenant and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

15. Beatrice Golden is currently a Sergeant and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

16. John Siino is currently a Sergeant and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

17. Caroline Clark is currently a Captain and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

18. Daniel Zieser is currently the Deputy Chief of Police and an employee of the Newark Police Department, who took actions to aid or abet in the illegal conduct complained of hereunder and/or who took actions that serve as the factual predicate for the illegal conduct complained of hereunder.

19. All defendants are individually subject to the statutes referenced herein.

20. At all times referred to in this complaint, employees of the Newark Police Department, who are referred to herein, were acting within the scope of their employment at the workplace during working hours or the corporate and/or municipal defendant ratified, embraced and added to their conduct to the extent that their actions went beyond the scope of their employment.

3

### III. Factual Allegations

21.   Plaintiff, began working as police officer on July 29, 1996 for the Newark Police
      Department.

22.   On July 18, 2005, Plaintiff was working as a detective in the taxi division.

23.   On this date Plaintiff was inside a daycare center on 300 Chancellor Avenue, Newark, NJ
      when she heard gun shots fired outside.

24.   Plaintiff subsequently apprehended a suspect, Khalil Tutt ("Tutt"), who was running from the
      area where the shots were fired.  Thomas' actions were memorialized in her police report.
      Thomas has made numerous efforts to obtain a full copy of her report.  (Exhibit "3").
      However, defendants have provided her only one page of her report. (Exhibit "4").

25.   Plaintiff subsequently learned that two officers, SPOA Dwayne Reeves, and SPOA Akia
      Scott were shot. SPOA Reeves was mortally wounded.

26.   Thomas' actions were so commendable in apprehending the suspect, that Police Director,
      Anthony F. Ambrose, III, issued a formal commendation lauding Thomas as a "hero" for her
      efforts in causing the capture of Tutt. (Exhibit "5").

27.   Thomas' commendable actions were consistent with her excellent service record as a police
      officer.  Although she had been in the police force for over a decade, she had no citizen
      complaints that were deemed founded and only one departmental complaint that was
      sustained in June 2005.

28.   Over two years later, on September 17, 2007, the Superior Court for Essex County heard the
      trial of *State v. Khalil Tutt a/k/a Omar Tindel.*

29.   On September 19, 2007, the Essex County Prosecutor's office subpoenaed Plaintiff to testify
      at trial, on September 24, 2007. (Exhibit "6").

30.   On September 24, 2007, Plaintiff met with Bernie Serra ("Serra"), investigator for the
      Prosecutor's office and assistant to Prosecutor Gary Bogdanski ("Bogdanski"), to discuss her
      testimony.

31.   Bogdanski never spoke to Thomas and decided not to have her testify for the Prosecution.

32.   On September 24, 2007, Tutt's counsel subsequently subpoenaed Plaintiff to testify at trial
      on October 1, 2007. (Exhibit "7").

4

33.   Plaintiff received this subpoena at roll call during work.  Lieutenant Wilfredo Mercardo informed plaintiff that defendants received a subpoena for her to provide testimony.  Thomas obtained the subpoena and signed the subpoena control desk log book acknowledging receipt of the subpoena.

34.   Captain Domingos Saldida's function was to review the subpoena control desk log book so as to keep control of personnel's court appearances.

35.   On September 25, 2007, Thomas discussed the subpoena with Serra.

36.   Serra informed Thomas that if she was subpoenaed by Tutt's defense attorney, she was compelled to appear.

37.   Plaintiff was ultimately called to testify for Tutt on October 4, 2007.

38.   During Thomas' testimony, she was asked whether she saw a gun in Tutt's hand and she answered that she had not.

39.   Defendants desired Thomas to testify that she saw Tutt with a gun.  Alternatively, defendants desired Thomas to testify that she lost sight of Tutt while she was chasing him where there might he might have given the gun to some other person.  Additionally, defendants desired Thomas to testify that Tutt's sister, Jalisa Tutt, came into physical contact with Khalil Tutt.

40.   However, Thomas could not testify that she saw Tutt with a gun.  Further, Thomas could not testify that she lost sight of Tutt while she was chasing him.  Additionally, Thomas could not testify that she saw Tutt give a gun to some other person.

41.   Thomas would have committed perjury to testify in such a fashion.  Thomas refused to engage in such actions and testified in accordance with what she actually observed. (Exhibit "8").

42.   Thomas testified that she never saw Tutt with a gun.  Further, she testified that she did not lose line of sight with Tutt when she was chasing him.  Further, she testified that she did not see Tutt give a weapon to some other person.  Additionally, she did not testify that Jalisa Tutt came into physical contact with Tutt.

43.   On October 5, 2007, The Star Ledger included an article titled, "Newark Copy Testifies for the Defense." (Exhibit "9").

44.   On that same day, defendants initiated an investigation on Thomas through Internal Affairs.

5

45.   Defendants are contractually obligated to issue an Investigation of Personnel ("IOP"), advising the officer that they are under the investigation, prior to the commencement of an investigation of personnel.

46.   No IOP was issued.

47.   Defendants then engaged in numerous actions to violate her privacy.

48.   LT Dennis Sanders ("Sanders") from the Internal Affairs Department checked Thomas' voting card, reviewed her financial records and credit report, reviewed all places where Thomas resided, checked the names of all persons who resided with Thomas, investigated her family members, etc. (Exhibit "10").

49.   Thomas was never notified of this investigation and never authorized such an investigation.

50.   Internal Affairs included press releases pertaining to Thomas' testimony in the Internal Affairs file.

51.   On October 15, 2007, the jury rendered a verdict of guilty of reckless manslaughter and not guilty to murder.

52.   What followed next was a veritable maelstrom of negative press assailing Thomas for her testimony and blaming her for the not guilty to murder verdict. (Exhibit "11").

53.   Subsequently, defendants engaged in retaliatory actions against Thomas as they blamed her for the jury verdict, as admitted to by Bogdanski in an interview with LT Yvonne Roman ("Roman") of the Internal Affairs Division.

54.   The Superior Officers generate a monthly newsletter referred to as the Superior Officers' Association Newsletter.   This newsletter contained an article written on October 15, 2007, titled "A Very Dark Day in Newark." (Exhibit "12").

55.   This article made clear the sentiment of defendants.

56.   The article referred to Thomas and accused her of turning on her fellow cops.  The article specifically criticized Thomas for testifying truthfully that she did not see Tutt with a gun. The article thanked the fact that Thomas was not a superior and stated that if she was part of the superiors, "she wouldn't be here much longer."  The article made further reference to cops supporting each other and Special Officer Reeves' family and the "thin blue line" and

6

loyalty and camaraderie. The article then stated that cops owed it to put Tutt in jail for murder and implored all officers, "To do something about it."

57. Further, police officers engaged in blatant acts of hostility and hatred towards Thomas. She was slandered and isolated.

58. In fact defendants' actions were so deplorable that Thomas was compelled to write to the NJDOP to postpone her sitting for the promotional sergeant examination. (Exhibit "13").

59. Within hours of the jury verdict, defendants suspended Thomas and brought her up on one charge of failure to notify the commander that she received a subpoena to testify for the defense.

60. Defendants accused Thomas of not submitting a 1001 Report (Captain's Report). This report merely formally informed the command that Thomas had received a Trial Subpoena from defense counsel.

61. Thomas was not aware that such a report had to be filled out as she had never previously been subpoenaed by defense counsel. Further, the command was on notice of the subpoena as it was the entity that gave the subpoena to Thomas and Thomas signed for the subpoena in the subpoena control desk log book that was monitored by the Captain as part of his daily duties.

62. Additionally, the Court Procedures section of the Rules and Regulations for Officers contains nothing on what officers should do when subpoenaed by Defense counsel. In fact, the only section to discuss the topic is noted in the "Outside Activities section," 4:4.4 or 4:4.5, which merely requires that an officer advise or notify the command that the officer received a subpoena. (Exhibit "14").

63. Thomas complied with these requirements as the command gave the subpoena to her, and she notified the command of the subpoena by signing the subpoena control desk log book. (Exhibit "15").

64. Defendants placed Thomas on an Immediate Suspension Notice. (Exhibit "16"). This notice was signed by the Union Representative, Police Officer Jose Figueroa and Supervisor, Captain Golden Raymond, 2nd Precinct Executive Officer ("Raymond"). Neither individual made comment or objection to the Notice. Rather, Raymond stated that the suspension was

7

immediate and indefinite and came from "upstairs," making reference to the Police Director, Garry McCarthy's office on the 4th floor of 31 Green Street.

65.  The next day, Acting Chief of Police, Daniel J. Zieser issued Personnel Order No. 2007-365, dated October 16, 2007, placing Thomas on "Immediate Suspension" without pay, effective 1855 hours, Monday October 15, 2007. (Exhibit "17").

66.  Defendants' action of placing Thomas on "Immediate Suspension" violated General Order 07-06 as no hearing had taken place, no IOP had been issued, and the criteria as set forth to immediately suspend an officer was not met. (Exhibit "18").

67.  Additionally, the rules for discipline allowed several lesser penalties for such an alleged violation. (Exhibit "19").

68.  On October 16, 2007, Roman from Internal Affairs directed Thomas to respond to Internal Affairs regarding the October 5, 2007 article published in the Star Ledger, "Newark Cop Testifies for the Defense."

69.  On October 17, 2007, Thomas was compelled to meet with Roman who further informed Thomas that she was being officially investigated and informed her that the Interrogation was custodial in nature. Thus, Roman informed Thomas of her Miranda rights and had her sign a "Pre-Interview Advisement Form." (Exhibit "20"). Defendants had FOP Lodge #12 Union Third Vice President, Detective Walter Melvin, and Union counsel, Paul Ulick, Esq. present during the proceeding.

70.  Despite Thomas being called in for a formal proceeding by defendants, she was not paid for the day.

71.  On October 19, 2007, defendants issue another five charges against Thomas for events that allegedly occurred on April 7, 2006 and other dates. (Exhibit "21"). The only way defendants could have any legitimacy in issuing the charge of "Cooperation," is if Bogdanski informed them that Thomas was not cooperating with the Prosecution, was being combative and gave false statements. However, Bogdanski testified at the Police Trial that Thomas was cooperative as opposed to combative and Thomas did not give false statements. This thus reflected yet another malicious charge, completely bereft of any merit, filed against Thomas and another retaliatory action by defendants.

72. Although defendants compelled Thomas to spend her time at the work place, responding to inquiries by agents of her employer, defendants failed to pay her any wages for this time period.

73. On October 26, 2007, Director of Police Garry F. McCarthy ("McCarthy") conducted a hearing pertaining to Thomas' suspension. After hearing the evidence, McCarthy felt compelled to return Thomas to work. (Exhibit "22").

74. On October 29, 2007, McCarthy transferred Thomas from the 2nd Precinct to Communications Division. (Exhibit "23").

75. Additionally, on October 31, 2007, Captain Richard Cuccolo ("Cuccolo") changed Thomas' Tour from M-F, 8am-4pm to Rotating Shifts, 10pm-6am. For five (5) years, Thomas had weekends off and a regular work day. Defendants change meant Thomas had to work most weekends and the Grave Yard shift. Cuccolo gave no reason for the action which was clearly retaliatory against Thomas. (Exhibit "24").

76. Subsequently, Cuccolo decided to embarrass and humiliate Thomas publicly by contacting the Star Ledger newspaper and informing them that Thomas had been transferred and placed on the night shift subsequent to her testimony at the trial.

77. On November 1, 2007, Thomas sent defendants a formal complaint of the emotional trauma, hostile work environment, and defamation defendants were causing to her. She outlined her treatment by fellow officers, the newsletter, the comments and looks of hatred by other officers, etc. (Exhibit "25").

78. Defendants took no follow up action until February 2008 – four months after Thomas filed her formal Complaint.

79. When Affirmative Action finally did take action in February 2008, all it did was to send the complaint back to Internal Affairs in the police department to investigate it.

80. Thus, the complaint was sent back to the same individuals who were harassing and mistreating Thomas.

81. On November 5, 2007, the President of the Union, Derrick Hatcher ("Hatcher"), sent McCarthy plaintiff's complaint which contained an allegation of hostile work environment. (Exhibit "26").

9

82. Defendants never responded to Hatcher's letter.

83. On November 5, 2007, Thomas was brought back into Internal Affairs and charged with yet another charge of neglect of duty, subjected to yet another custodial interrogation by Roman, and, once again, informed her of her Miranda rights and Garity Rights. (Exhibit "27").

84. These actions resulted in significant and severe emotional distress to Thomas. Thus, she notified defendants and began weekly psychotherapy treatment with Susan J. Fuls, Ph.D.

85. On November 6, 2007, McCarthy informed Thomas that she was directed to appear at the Director of Police's office for her Department Trial to terminate her employment. (Exhibit "28").

86. A mere two days after Roman questioned Thomas, Roman then sent Thomas a letter dated November 7, 2007, stating that the charges were "fully investigated" and the complaint "Sustained" for "Subpoenaed by Defense in Criminal Case, Neglect of Duty, False Statements, Cooperation, Conduct, Volunteering Information, Response to Questions." (Exhibit "29").

87. On November 9, 2007, defendants issue two additional charges against Thomas for events that allegedly occurred on October 4, 2007 pertaining to her trial testimony. (Exhibit "30").

88. On November 23, 2007, Thomas filed a formal complaint of the illegal and retaliatory actions by defendants and requested an investigation into her allegations. (Exhibit "31").

89. Thomas alleged that the Prosecutor's office was well aware that evidence from the Tutt trial would show that the bullet that killed Special Officer Dwayne Reeves came from Special Officer Akia Scott's gun – as opposed to Tutt.

90. Thomas sent this formal complaint to Captain Inez Gonzalez, Chief of Police Anthony Campos, Police Director Garry McCarthy, and FOP President Derrick Hatcher.

91. Defendants acknowledged receipt of this serious accusation and failed to do any investigation or take any remedial action. Rather, defendants retaliated against plaintiff.

92. On December 12, 2007, Dr. Fuls informed defendants that Thomas was no longer fit for duty due to the Post Traumatic Stress Disorder as a result of the events surround the trial of Khalil Tutt aka Omar Tindell. (Exhibit "32").

93. On January 11, 2008, Darlene Noble ("Noble") from the Office of Affirmative Action acknowledged receipt of plaintiff's November 1, 2007 complaint. (Exhibit "33").

94. On February 7, 2008, Thomas received correspondence from Noble to McCarthy informing that the Affirmative Action Review Panel was recommending that the Police Department Internal Affairs Office investigate and resolve the matter. (Exhibit "34").

95. Two weeks later, on February 21, 2008, LT Crystal Burroughs served Thomas with five (5) additional charges of: "Mental and Physical Capability", "Inability to Perform Duties", "Malingering", "Malingering", and "Cooperation". (Exhibit "35").

96. Defendants charged plaintiff with not complying with their doctor, Guillermo Gallegos, M.D.'s requests made when he performed an Independent Medical Examination of Thomas.

97. The only way defendants could have any legitimacy in issuing such a charge is if Dr. Gallegos informed them that Thomas was not complying with his requests and that Thomas was engaging in malingering.

98. However, Dr. Gallegos testified at the Police Trial that Thomas was cooperative and did not engage in malingering. He further testified that Thomas' actions pertaining to completing his tests were consistent with any individual who was going through the stress Thomas was enduring.

99. Defendants' actions, thus, reflected yet another malicious charge, completely bereft of any merit, filed against Thomas and another retaliatory action by defendants.

100. The continuation of defendants' actions thus led Dr. Fuls to support and certify that plaintiff should receive disability benefits and that plaintiff should be approved for Disability Retirement as of February 24, 2008. (Exhibit "36").

101. On March 18, 2008, Sgt. Beatrice Golden served Thomas with three (3) additional charges of Obedience to Orders, Cooperation, and Responsibility for Own Actions. (Exhibit "37").

102. These charges alleged that Thomas did not respond to a voice mail directing her to meet with Sergeant John Siino ("Siino") to discuss Thomas' complaint of hostile work environment after he allegedly called her on February 25, 29, and March 3, 2008.

103. On February 28, 2008, Thomas received Siino's letter asking her to call him. (Exhibit "38"). Thomas called him and left a message on Siino's voicemail.

11

104. On February 29, 2008, Siino returned Thomas' phone call. Thomas advised that she would meet with him and wanted to discuss the matter with her counsel first. Siino stated no objection and asked Thomas to call him back.

105. On March 6, 2008, Thomas and her counsel met and immediately contacted Siino to state that they were ready, willing and able to meet with him. Siino then stated that he refused to meet as he had closed out his investigation.

106. On March 18, 2008, plaintiff's counsel sent Siino correspondence memorializing this discussion. (Exhibit "39").

107. Plaintiff then received Siino's letter dated March 3, 2008 stating he closed the investigation. (Exhibit "40").

108. Thomas filed her charge of hostile work environment on November 1, 2007. The fact that Siino took so long to investigate the complaint demonstrates the retaliation defendants engaged in. Despite the fact that Thomas was the complainant and normal protocol is to commence an investigation by speaking to the complainant, Thomas had received no phone call from Siino, or anyone else investigating her November 1, 2007 Complaint, until she received Siino's February 28, 2008 voicemail.

109. Thus, despite the fact that almost five (5) months had gone by with Siino taking no action on plaintiff's charges, he decided to close out the file because it took Thomas approximately one week to meet with her lawyer to call him.

110. Thomas then went to a Police Trial that occurred on March 24, 2008, April 3, 2008, and April 8, 2008. The trial was presided over by Captain Ronald Kinder, Captain Caroline Clark, Captain Robert Sbaraglia, and the alternate of Captain Eugene Venable (hereinafter, collectively referred to as the "Police Trial Board").

111. On April 3, 2008, during Thomas' Police Trial, SGT Beatrice Golden ("Sgt. Golden") of Internal Affairs accused Thomas of having a recording device in her purse. Sgt Golden then contacted the Internal Affairs Division to report Thomas.

112. Four corporate counsel from the City of Newark then came into the room with two supervisors from Internal Affairs, SGT Clifford Spencer ("SGT Spencer") and LT Tijuana Burton ("LT Burton"). CAPT Clark then accused Thomas of having a recording device.

CAPT Clark directed Thomas to accompany SGT Spencer and LT Burton, with Thomas' purse and other belongings, to Internal Affairs.

113. Defendants made it clear that their intention was to arrest Thomas and charge her with wiretapping. In fact, LT Burton called the prosecutor's office in front of Thomas to discuss this issue.

114. Defendants then photographed the contents of all plaintiff's belongings and made plaintiff provide a statement.

115. Although defendants never found a recording device in Thomas' purse or personal belongings, they offered no apology for their actions.

116. The Police Trial then resumed on April 8, 2008. At the end of this multi-day proceeding, the Police Trial Board found Thomas guilty of not advising her commanding officer of the defense subpoena and guilty that she did not respond briefly and specifically enough to defense counsel's questions during the Tutt trial. These charges warranted a 30 day suspension without pay. The remainder of the initial charges were dismissed. (Exhibit "41").

117. The Police Trial Board then considered the additional charges and dismissed those charges. (Exhibit "42").

118. The Police Trial Board then considered the second additional charges and found Thomas unfit for duty as she suffered from a medical condition as a result of work. The rest of the additional charges were dismissed. Based on this finding, the Police Trial Board terminated Thomas. (Exhibit "43").

119. Additionally, Thomas requested a copy of the Form 802 (the police incident report) that was required for her disability retirement. Defendants intentionally delayed providing this document to Thomas which in turn delayed Thomas obtaining disability benefits.

120. Defendants were well aware that Thomas was in treatment with various physicians due to the severe and outrageous emotional distress caused by defendants.

121. Defendants were well aware that disrupting Thomas' status as an active employee or disrupting Thomas' entitlement to healthcare benefits would have severe repercussions to Thomas.

13

122. Additionally, defendants were well aware that Thomas' disability retirement date was set as May 1, 2008. Despite having knowledge of this retirement date, defendants notified Thomas on April 16, 2008 that defendants had terminated her effective April 8, 2008. (Exhibit "44"). Defendants took these actions to cause further distress to Thomas.

123. Thomas should have received her final payroll and overtime on April 10, 2008. However, defendants breached its obligations by not making this payment in the amount of approximately $1,700 (one thousand seven hundred dollars) until April 23, 2008.

124. At the time of her termination, plaintiff was making a salary of approximately $103,000/year. Further, plaintiff received deferred compensation into an annuity plan, life insurance, supplemental life insurance, leased automobile, medical benefits, dental insurance, a vision discount program, paid vacation of 25 days per year, approximately 12 company paid holidays, unlimited sick days per year, 5 days of bereavement leave per year, accidental death and dismemberment coverage, short term disability insurance, and long term disability insurance.

125. These benefits of employment make up plaintiff's claim for damages.

**Count I**
**(42 U.S.C. § 1983)**

126. The plaintiff repeats, and incorporates herein the above referenced paragraphs verbatim.

127. Defendants conspired to violate Plaintiff's constitutional rights as set forth in the United States Constitution by denying her the rights and protections conveyed by the Constitution to include but not be limited to freedom of speech, in violation of 42 U.S.C. § 1983.

128. As a direct and proximate result of defendants' actions, plaintiff has suffered the deprivation of precious Constitutional rights, mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional and physical condition. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has

and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

129. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

### Count II
### (42 U.S.C. § 1985)

130. The plaintiff repeats, and incorporates herein the above referenced paragraphs verbatim.

131. Defendants conspired to violate Plaintiff's constitutional rights as set forth in the United States Constitution by denying her the rights and protections conveyed by the Constitution to include but not be limited to freedom of speech, in violation of 42 U.S.C. § 1985.

132. As a direct and proximate result of defendants' actions, plaintiff has suffered the deprivation of precious Constitutional rights, mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional and physical condition. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

133. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

15

## Count III
### (42 U.S.C. § 1988)

134.    The plaintiff repeats, and incorporates herein the above referenced paragraphs verbatim.

135.    Defendants conspired to violate Plaintiff's constitutional rights as set forth in the United States Constitution by denying her the rights and protections conveyed by the Constitution to include but not be limited to freedom of speech, in violation of 42 U.S.C. § 1988.

136.    As a direct and proximate result of defendants' actions, plaintiff has suffered the deprivation of precious Constitutional rights, mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional and physical condition.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

137.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## Count IV
### (Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. "CEPA")

138.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint, unless noted below.

139.    Plaintiff testified truthfully against the interests of defendants.

140.    Further and separately, plaintiff objected to defendants engaging in illegal, immoral, and or offensive actions pertaining to the handling of evidence and other matters.

141.   Defendants failed to stop their actions and failed to take remedial action.

142.   Additionally, Defendants retaliated against Plaintiff because Plaintiff did one or more of the following:

(a) disclosed or threatened to disclose to a supervisor or a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the Plaintiff reasonably believed is in violation of a law, or a rule or regulation promulgated pursuant to law;

(b) Provided information to, or testified before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer, with whom there is a business relationship; or

(c) Objected to, or refused to participate in an activity, policy or practice which Plaintiff reasonably believed:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law or

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of a public policy concerning the health, safety, or welfare or protection of the environment.

143.   The above actions of Defendants demonstrate that they are in violation of CEPA.

144.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional condition.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has and/or may have to incur expenses for medical,

17

psychiatric, and/or psychological counseling and care.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

145.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

### Count V
### (Common law-Whistleblower/Retaliation)

146.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

147.   The foregoing facts and circumstances demonstrate that defendants have violated their common law obligations set forth by the New Jersey Supreme Court in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980).

148.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional condition.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

149.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

18

### Count VI
### (Intentional Infliction of Emotional Distress)

150.    Plaintiff realleges and incorporates herein the above paragraphs.

151.    Thomas has undergone treatment with mental health providers and evaluation meetings with mental health care evaluators due to the intense emotional distress that she suffered.

152.    The actions of the Defendants were undertaken in conscious disregard of moral, legal, and civil obligations and in wanton, reckless, and outrageous disregard for the rights, feelings, and sentiments of Plaintiff. Such conduct has been extreme and outrageous.

153.    As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional condition. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

154.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

### Count VII
### (Invasion of Privacy)

155.    Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

156.    The foregoing facts and circumstances demonstrate that Defendants have caused a violation of invasion of privacy.

19

157. As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional condition. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

158. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## Count VIII
### (Breach of Express Contract)

159. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

160. Defendant's actions give rise to the claim of breach of express contract.

161. As a direct and proximate result of the actions of Defendant, Plaintiff has been damaged.

## Count IX
### (Breach of Implied Contract)

162. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

163. Defendant's actions give rise to the claim of breach of implied contract.

164. As a direct and proximate result of the actions of Defendant, Plaintiff has been damaged.

## Count X
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

165. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

166.   The actions of Defendants give rise to the claim of breach of the implied covenant of good faith and fair dealing.

167.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional condition. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

168.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

### Count XI
### (New Jersey Wage Payment Act, N.J.S.A. 34:11-4.1, *et seq.*)

169.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

170.   The actions of Defendants give rise to a violation of the New Jersey Wage Payment Act.

171.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, and/or aggravation of a previously existing mental or emotional condition. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

172.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.


**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against the Defendants jointly and severally, as follows:

    A.    Compensatory damages of not less than $1,000,000;

    B.    Damages for lost wages and benefits, back pay, front pay (or promotion);

    C.    Promotion to Sergeant with an effective date of October 2007 and credit for seniority based on this retroactive promotion date;

    D.    Damages for humiliation, mental and emotional distress;

    E.    Statutory damages, if applicable;

    F.    Punitive damages and or liquidated damages where permitted by law;

    G.    Attorneys' fees and costs of suit;

    H.    Lawful interest - including pre-judgment interest on lost wages;

    I.    Lawful interest - including pre-judgment interest on any wages not paid in a timely manner; and

    J.    Such other, further and different relief as the Court deems fitting, just and proper.


Plaintiff hereby reserves the right to amend this Complaint to supplement or modify the factual obligations and claims contained herein, based upon information received from the defendants, witnesses, experts, and others in the course of discovery in this matter.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule, plaintiff respectfully demands a trial by jury on all issues in the within action so triable.

## DESIGNATION OF TRIAL COUNSEL

In accordance with rule, TY HYDERALLY is hereby designated as trial counsel on behalf of plaintiff.

## CERTIFICATION OF NO OTHER ACTIONS OR PARTIES

I hereby certify that there are no other parties known to me at this time who should be joined as parties to this action.

## DEMAND FOR PRODUCTION OF INSURANCE AGREEMENTS

Pursuant to rule, demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.

If so, please attach a copy of each, or in the alternative state, under oath and certification: (A) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all persons insured thereunder; (e) personal injury limits; (f) property damage limits; and (g) medical payment limits.

DATED:       May 19, 2008

LAW OFFICES OF TY HYDERALLY, PC
*Attorneys for Plaintiff*

By: _____
TY HYDERALLY, Esq.
For the Firm

H:\1Law Offices of Ty Hyderally\Thomas Karama\Pleadings\051908.COM.doc

23